IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1917-06






RAUL ADAM MARTINEZ, JR., Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRTEENTH COURT OF APPEALS


HARRIS COUNTY





 Johnson, J., delivered the opinion of the Court, in which Price,
Womack, Holcomb, and Cochran, JJ., joined. Price, J., filed a concurring opinion. 
Hervey, J., filed a dissenting opinion in which Keller, P.J., and Meyers and
Keasler, JJ., joined.


O P I N I O N 



 Raul A. Martinez, Jr., appeals his conviction for capital murder. (1) Because the state chose not
to seek the death penalty, the jury's finding of guilt resulted in a sentence of life in prison. The
Thirteenth Court of Appeals upheld his conviction. (2) Martinez v. State, 204 S.W.3d 914 (Tex.
App.--Corpus Christi 2006). This Court granted appellant's petition for discretionary review:
"Whether the court of appeals misapplied the standards of Seibert in determining that a proper and
functional Miranda warning was given appellant here and finding appellant's custodial statement
admissible." We reverse.

FACTS

 In the early morning of August 2, 2003, Alfredo Balderas Loredo, Gustavo Camilo, and
Manuel Arriaga Molina were socializing in the rear of an apartment complex in Houston when two
men approached them with a rifle and a pistol. Two of the victims described the man carrying the
rifle as a short, heavy, Hispanic male and the man carrying a pistol as a tall, skinny, Hispanic male. 
Mr. Balderas testified that the shorter man pressed the rifle into his abdomen and demanded money. 
Simultaneously, the taller man pointed the pistol at the other two victims and demanded money. Mr.
Arriaga gave his wallet to the taller man, who responded by shooting Mr. Arriaga in the groin. Mr.
Camilo also gave his wallet to the taller man, who responded by shooting Camilo in the stomach. 
The men pushed Mr. Balderas to the ground, took his wallet, shot him in the neck, and fled. Still
alert, Mr. Balderas used his cell phone to call his brother-in-law, and his brother-in-law called the
police. The three victims were taken to the hospital. Mr. Balderas was treated for his injuries and
released that night. Mr. Camilo was hospitalized for a longer period of time and underwent multiple
surgeries. Mr. Arriaga died a few hours after the incident.

 Detectives Macario Sosa and Toby Hernandez of the Houston Police Department's homicide
division investigated the case. There were no suspects until the officers were informed of a Crime
Stoppers tip identifying appellant and James Ruiz as the primary suspects. Appellant matched the
description of the short, heavy, Hispanic male, and Ruiz matched the description of the tall, skinny,
Hispanic male. Mr. Balderas identified both appellant and Ruiz in a photo array. Mr. Camilo was
able to identify only appellant. Officer Sosa secured a "pocket warrant" (3) for appellant's arrest. (4)

 On November 18, 2003, Officer Sosa arrested appellant in a convenience-store parking lot. 
Appellant was driving a late-model green Chevy Malibu. (5) At the time of his arrest, police did not
give appellant Miranda warnings. At police headquarters, Officers Sosa and Hernandez questioned
appellant about the robbery and murder. Appellant, however, denied knowing anything about the
incident.

 Shortly thereafter, Officers Sosa and Hernandez took appellant to a police polygrapher, who
used the case file to develop the questions to be asked and then administered a polygraph test to
appellant. This process took three to four hours to complete. The record does not reflect the name
of the officer who administered the test, and when asked, Officer Sosa could not identify the officer. (6) 
Likewise, the questions that were asked during the polygraph examination are not in the record.

 After the test, Officers Sosa and Hernandez again took custody of appellant, and Officer Sosa
informed appellant that he had failed the polygraph exam. (7) Officer Sosa conceded that it is not
customary for a suspect to be informed that he "failed" a test; suspects are usually informed that
"deception was indicated on some of the test questions." The record is silent as to which questions
the polygrapher determined that appellant had answered deceptively. Officers then took appellant
to municipal court, where a magistrate gave appellant Miranda and other statutory warnings for the
first time.

 Upon appellant's prompt return to the central holding station, Officers Sosa and Hernandez
again questioned appellant about the robbery and murder. Officer Sosa repeated the Miranda
warnings, and appellant gave a videotaped statement regarding the incident. (8) At the beginning of
the video, appellant stated that he had become aware of certain facts about the crime through the
polygraph examiner. Although before the polygraph appellant asserted that he was not aware of the
robbery and murder, on the videotape appellant discussed pertinent information regarding the crime. 
Appellant further stated that he was not one of the assailants who had robbed and shot the victims,
but rather was a "lookout" person. He maintained that he had remained in the backseat of his Chevy
Malibu throughout the incident. Appellant had initially stated that there were only three persons
involved, but after Officer Sosa informed him of conflicting information, he then stated that there
were four persons involved in the incident. Appellant also asserted that the individual who was
actually carrying the rifle resembled appellant and that they could easily have been mistaken for each
other.

 The state indicted appellant for capital murder. Before trial, appellant filed a motion to
suppress his statement and requested a hearing. At the hearing on that motion, appellant sought to
suppress the videotaped statement because he had not received Miranda warnings when he was
arrested or before the polygraph examination. Officer Sosa was the state's sole witness at the
hearing. The trial court found Officer Sosa to be a credible witness, concluded that appellant had
voluntarily and knowingly waived his right to remain silent, and admitted the videotaped statement. 
 On appeal, appellant's sole issue was that the "failure to Mirandize appellant before the initial
interrogation and the polygraph examination led to constitutional error in the admission of his
videotaped statement at trial." Martinez, 204 S.W.3d at 914. The court of appeals affirmed
appellant's conviction, finding that appellant did not satisfy the five factors set out in Missouri v.
Seibert, 542 U.S. 600 (2004). It further stated that the admission of the videotaped statement did not
constitute constitutional error because it was made after a proper and functional Miranda warning. 
Id. at 922.

 In his petition to this Court, appellant's sole claim is that the court of appeals misapplied the
standards of Seibert when it considered whether a proper and functional Miranda warning was given.

SEIBERT

 Patricia Seibert was charged with murder. After her arrest, she gave a confession about the
murder without being given Miranda warnings. (9) Seibert, 542 U.S. at 600. (10) The detective returned
20 minutes later, gave Miranda warnings, and obtained a signed waiver and a second confession. 
 Before trial, Seibert sought to exclude both the unwarned and warned statements. The Missouri trial
court excluded only the unwarned statement, and the defendant was convicted of second-degree
murder. The Missouri Supreme Court, however, reversed the defendant's conviction, stating that
the interrogation was continuous and that the second statement was the product of the invalid first
statement. The United States Supreme Court granted certiorari. A four-justice plurality also ruled
that Seibert's warned statements were inadmissible. Seibert, 542 U.S. at 616. The Court stated that

 when a confession so obtained is offered and challenged, attention must be paid to
the conflicting objects of Miranda and the question-first strategy. Miranda addressed
"interrogation practices . . . likely. . .to disable [an individual] from making a free and
rational choice" about speaking, 384 U.S. at 464-465, and held that a suspect must
be "adequately and effectively" advised of the choice the Constitution guarantees. Id.
at 467. Question-first's object, however, is to render Miranda warnings ineffective
by waiting to give them until after the suspect has already confessed . . .. By any
objective measure, it is likely that warnings withheld until after interrogation and
confession will be ineffective in preparing a suspect for successive interrogation,
close in time and similar in content. The manifest purpose of question-first is to get
a confession the suspect would not make if he understood his rights at the outset.
When the warnings are inserted in the midst of coordinated and continuing
interrogation, they are likely to mislead and "deprive a defendant of knowledge
essential to his ability to understand the nature of his rights and the consequences of
abandoning them." Moran v. Burbine, 475 U.S. 412, 424 (1986).


Id. at 601. The plurality further emphasized that

 the threshold issue when interrogators question first and warn later is thus whether
it would be reasonable to find that in these circumstances the warnings could
function "effectively" as Miranda requires. Could the warnings effectively advise the
suspect that he had a real choice about giving an admissible statement at that
juncture? Could they reasonably convey that he could choose to stop talking even if
he had talked earlier? For unless the warnings could place a suspect who has just
been interrogated in a position to make such an informed choice, there is no practical
justification for accepting the formal warnings as compliance with Miranda, or for
treating the second stage of interrogation as distinct from the first, unwarned and
inadmissible segment.


Id. at 611-12.


 The plurality crafted a multi-factor test for determining "whether Miranda warnings delivered
midstream" could be effective.

 The contrast between Elstad and this case reveals a series of relevant facts that bear on
whether Miranda warnings delivered midstream could be effective enough to accomplish
their object: the completeness and detail of the questions and answers in the first round of
interrogation, the overlapping content of the two statements, the timing and setting of the
first and the second, the continuity of police personnel, and the degree to which the
interrogator's questions treated the second round as continuous with the first.

 

Id. at 615-16.

 Although agreeing "with much in the careful and convincing opinion for the plurality,"
Justice Kennedy's concurring opinion took a narrower view-Oregon v. Elstad, 470 U.S. 298 (1985),
should be followed unless there is proof that the interrogating officer knowingly and willing utilized
the two-stage technique, thus undermining Miranda warnings. Justice Kennedy's focus was on
"whether admission of the evidence under the circumstances would frustrate Miranda's central
concerns and objectives." Seibert at 619 (Kennedy, J., concurring). He stated that

[t]he plurality concludes that whenever a two-stage interview occurs, admissibility
of the postwarning statement should depend on "whether [the] Miranda warnings
delivered midstream could have been effective enough to accomplish their object"
given the specific facts of the case. This test envisions an objective inquiry from the
perspective of the suspect, and applies in the case of both intentional and
unintentional two-stage interrogations . . .. In my view, [the plurality's] test cuts too
broadly . . .. I would apply a narrower test applicable only in the infrequent case, such
as we have here, in which the two-step interrogation technique was used in a
calculated way to undermine the Miranda warning . . .. Miranda's clarity is one of
its strengths, and a multifactor test that applies to every two-stage interrogation may
serve to undermine that clarity. Cf. Berkemer v. McCarty, 468 U.S. 420, 430 (1984). 


The admissibility of postwarning statements should continue to be governed by the
principles of Elstad unless the deliberate two-step strategy was employed. If the
deliberate two-step strategy has been used, postwarning statements that are related
to the substance of prewarning statements must be excluded unless curative measures
are taken before the postwarning statement is made. Curative measures should be
designed to ensure that a reasonable person in the suspect's situation would
understand the import and effect of the Miranda warning and of the Miranda waiver. 
For example, a substantial break in time and circumstances between the prewarning
statement and the Miranda warning may suffice in most circumstances, as it allows
the accused to distinguish the two contexts and appreciate that the interrogation has
taken a new turn. Cf. Westover v. United States, decided with Miranda v. Arizona,
384 U.S. 436 . . . (1966). Alternatively, an additional warning that explains the likely
inadmissibility of the prewarning custodial statement may be sufficient. No curative
steps were taken in this case, however, so the postwarning statements are
inadmissible and the conviction cannot stand.


Seibert at 621-22 (Kennedy, J., concurring). We find Justice Kennedy's reasoning persuasive.

ELSTAD

 Before Seibert, Elstad controlled when addressing Miranda warning violations and the
corresponding confessions. In Elstad, a suspect spoke a single incriminating sentence at his home. (11)
Elstad, 470 U.S. at 301. Elstad had not received a Miranda warning before making the statement,
apparently because the police officers did not believe that Elstad was in custody at the time of his
statement. Id. Elstad was taken to the police station, where he received a proper warning, waived
his Miranda rights, and made a second statement. Id. He later argued that the second statement
should be suppressed because it stemmed from the unwarned first statement. Id. at 302. The
Supreme Court held that, although a Miranda violation made the pre-Miranda-warning statement
inadmissible, the warned statements could be introduced against the accused because, given the facts
of the case, "neither the general goal of deterring improper police conduct nor the Fifth Amendment
goal of assuring trustworthy evidence would be served by suppression." Id. at 308 (citing Michigan
v. Tucker, 417 U.S. 433, 445 (1974)).

ANALYSIS

 This Court has not recently directly addressed midstream Miranda warnings such as those
given in this case, but before Seibert, in Jones v. State, 119 S.W.3d 766 (Tex. Crim. App. 2003), we
addressed facts similar to those presented here. Before receiving Miranda warnings, Jones orally
admitted his involvement in two murders. Id. at 771-72. An officer wrote down the defendant's
confession "verbatim" on a statement form. Id. After the first confession, the officer read the
defendant the Miranda warnings that appeared at the top of the written form. Id. The officer and
defendant read the statement simultaneously, then the defendant corrected mistakes, initialed
revisions, and signed the statement at the bottom. Id. We declined to apply Elstad, stating that,

 in contrast to Elstad, where the initial unwarned statement took place at the
defendant's home and the warned statement was given after transporting the
defendant to the police station, the unwarned and warned statements in this case were
given during a nearly undifferentiated single event, taking place in the same room as
an uninterrupted and continuous process. The written statement [taken by Texas
Ranger Akin] was literally a transcription of appellant's unwarned oral statement
after he finally received his Miranda warnings; he simply signed the written
statement that he had dictated to [the police officer] before he was warned. To apply
Elstad here and declare the [second] statement admissible by virtue of the late
admonishment of the required warnings would undermine the spirit and intent of
Miranda. The waiver of rights given in connection with the [second] statement was
not constitutionally valid in light of the circumstances and entire course of police
conduct.


Jones, 119 S.W.3d at 775. The Jones Court held that the second statement was inadmissible, but
found that the error in admitting it was harmless beyond a reasonable doubt.

 Here, the pertinent facts are undisputed: (1) appellant was in custody and under arrest for
capital murder; (2) Officer Sosa did not give appellant Miranda warnings at the time of his arrest;
(3) Officers Sosa and Hernandez questioned appellant about the crime at the police station without
giving the required warnings; (12) (4) appellant did not receive Miranda warnings before being taken
for a polygraph examination; (13) (4) the identity of the polygrapher and the polygraph-examination
questions are not included in the trial or appellate record; (14) and (6) a magistrate read the Miranda
warnings to appellant only after both the first round of interrogation and the polygraph examination. 
Based on these facts, we have determined that "the two-step interrogation technique was used in a
calculated way to undermine the Miranda warning . . .." Seibert at 621 (Kennedy, J., concurring). 
 The parties assert contrary positions as to the completeness and detail of the questions and
answers in the first round of interrogation. Appellant contends that the court of appeals misapplied
the Seibert factors by failing to place the burden of proof on the state to satisfy the five factors,
including the questions from the first interrogation, and that it was the state's burden to show what
questions were used during the polygraph examination. 

 The state contends that appellant has the burden of producing an adequate record and that he
has failed to develop the record concerning what specific questions were asked during the polygraph
examination and any of the unwarned conversations. See Ortiz v. State, 144 S.W.3d 225 (Tex.
App.-Houston [14th Dist.] 2004, pet. ref'd) (stating that repeal of former rule (Rule 50(d)) of
appellate procedure does not absolve appellant of his burden of presenting a record to show error
requiring reversal insofar as he is required to develop record to show nature and source of an error). 
 The court of appeals took the same position, asserting that appellant did not submit an
adequate record regarding the unwarned statements and questions asked during the polygraph
examination. It stated that

 at the outset, we note that there is no record of Martinez's pre-warning statements
made to Officers Sosa and Hernandez or the polygraph examiner. The first two
factors that the Seibert plurality found relevant in determining whether Miranda
warnings delivered midstream are effective are the completeness and detail of the
questions and answers in the first round of interrogation and the overlapping content
of the two statements. The dissent is troubled by Martinez's two references to the
polygrapher telling him that three people were shot during the incident. Unlike
Seibert, Martinez was repeating the polygrapher's general statements regarding the
crime, not his own unwarned statements. Therefore, the first two Seibert factors are
not applicable in Martinez's case.


Martinez, 204 S.W.3d at 921. Indeed, the record is lacking; it does not contain a complete, or even
partial, description of the questions and answers in the first round of interrogation and polygraph test. 
Even so, this does not preclude analysis.

 The state, as the proponent of the evidence of appellant's confession, bears the burden of
establishing its admissibility. Tex. Rules Evid. 104(a). See also De la Paz v. State, ___ S.W.3d
___, 2008 Tex. Crim. App. LEXIS 751, at *26-27 (Tex. Crim. App. 2008); Cofield v. State, 891
S.W.2d 952, 954 (Tex. Crim. App. 1994). Further, we have long held that the prosecution bears the
burden of proving admissibility when a Miranda violation is found. See, e.g., Creager v. State, 952
S.W.2d 852, 860 (Tex. Crim. App. 1997); Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App.
1995) (quoting Colorado v. Connelly, 479 U.S. 157 (1986)). When the officers initially questioned
appellant at the police station without giving him Miranda warnings, they violated appellant's
constitutional rights. At the suppression hearing, the state failed to provide the polygrapher's name,
the questions used during the polygraph examination, or the content of the initial interrogation of
appellant, all of which are under the exclusive control of the state.

 The state also asserts that this case is distinguishable from Seibert because there is no
evidence that appellant made any incriminating statements before he was given his Miranda
warnings. We agree with Justice Kennedy (and the plurality in Seibert) that "not every violation of
[Miranda] requires suppression of the evidence obtained. Evidence is admissible when the central
concerns of Miranda are not likely to be implicated and when other objectives of the criminal justice
system are best served by its introduction." Seibert at 618-19 (Kennedy, J., concurring). In some
cases, an officer might not recognize that a suspect is in custody and that warnings are therefore
required. We also agree that the suppression of warned statements under such a circumstance would
serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal
of assuring trustworthy evidence." Elstad, 470 U.S. at 308. Indeed, Elstad provides a practical
approach to enforcing Miranda protections. "[A] suspect who has once responded to unwarned yet
uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has
been given the requisite Miranda warnings." Id. at 318. Contrary to Elstad, however, a Miranda
warning given midstream, as in this case, requires a closer examination of the investigatory
techniques used before and after Miranda warnings are given.

 When a question-first interrogation begins, it cannot be known whether the suspect will
incriminate himself, but the suspect's rights as set out in Miranda have already been violated.
Although both Elstad and Seibert involved incriminating statements in the first interrogation that
were repeated in the second, that was not the focus of the holdings. In both cases, the prime concern
was the constitutional rights that the Miranda decision was intended to protect. Seibert at 611, 619,
621 (whether warnings could function effectively, as Miranda requires (plurality); "whether
admission of the evidence under the circumstances would frustrate Miranda's central concern and
objectives"; whether the two-step interrogation technique was used in a calculated way to undermine
the Miranda warning (Kennedy, J., concurring)). It is immaterial to our consideration whether
incriminating statements emerged from the unwarned interrogation.

 Here, appellant was in custody for the purposes of Miranda; he gave both statements to law-
enforcement officials after his formal arrest pursuant to an arrest warrant, and both statements were
given at a police station. (15) This indicates that the absence of Miranda warnings at the beginning of
the interrogation process was not a mistake based on the interrogating officers' mistaken belief that
appellant was not in custody, but rather a conscious choice. (16)

 The state challenges the court of appeals's finding of continuity of police personnel, arguing
that there was a "substantial break" between the two statements; and that, therefore, the interrogation
was not continuous. The record does not support this argument. (17)

 The interrogation process was lengthy. Officer Sosa testified that he arrested appellant
midmorning and that he and Officer Hernandez first questioned appellant regarding the case around
10:00 a.m. Shortly after the first interrogation ended, appellant was taken to the polygrapher and
given a polygraph examination, which took three to four hours. Immediately following the
polygraph examination, appellant was taken to the municipal court, where a magistrate administered
Miranda warnings at approximately 5:00 p.m., seven hours after the first questioning. After being
arraigned, appellant was returned to the central holding station and gave his videotaped, warned,
second statement at approximately 5:15 p.m. (18)

 Determining whether a suspect was in the continuous presence of police personnel cannot
be accomplished by focusing on only the lapse of time between the two statements; it is determined
by considering all of the events that occurred between the unwarned statement and warned statement. 
Throughout the day of his arrest on this charge, appellant was with police officers or other police
department personnel or detained in a police facility. The same officers conducted the first and
second periods of questioning, and aside from the time during which the polygraph test was
administered by another police officer, they were both continuously with appellant. From arrest to
questioning to polygraph to magistration to questioning, the presence of police personnel was
uninterrupted. We discern no "substantial break in time and circumstances between the prewarning
statement and the Miranda warning."

 Appellant asserts that the court of appeals erred in failing to consider that Officers Sosa and
Hernandez did not tell him that all of the prior questioning was improper and that it could not be
used against him. The state argues that appellant was properly warned of his rights and waived them
before giving his videotaped statement.

 It is evident that the officers treated the videotaped interrogation as a continuation of the first;
as in Siebert, at the beginning of the second interrogation, Officer Sosa referred to the first
interrogation and restated what he had told appellant during the first interview. (19) While the questions
and answers from the first round of interrogation are not in the record, we can conclude from Officer
Sosa's reference to the first interrogation that appellant could reasonably assume that a continuity
existed between the two interrogations.

 On the video, Officer Sosa began by reading the Miranda warnings to appellant. He then
asked appellant if he understood his rights, and appellant replied affirmatively. Both officers,
however, failed to inform appellant that, based on the lack of Miranda warnings, any prior statement
made during a previous interrogation, including the polygraph exam, could be not used against him.

 The polygraph test, in and of itself, poses great concern. Before taking the polygraph,
appellant denied knowing about the crime. Officer Sosa failed to inform appellant that he could
refuse to take the polygraph test or that, after starting the test, he could stop at any time. See
generally Tex. Code Crim. Proc. art. 15.051. At the conclusion of the test, Officer Sosa informed
appellant that he had "failed" the test without indicating that the results showed deception as to some
answers, nor did he tell appellant which questions appellant had answered deceptively. As
previously noted, the polygraph examiner, and the facts learned by appellant from the polygraph
examiner, were mentioned by appellant and the officers in the video. It has long been the rule in this
state that references to a polygraph test, or to its results, are inadmissible for all purposes. See Nesbit
v. State 227 S.W.3d 64, 66 (Tex. Crim. App. 2007) (quoting Nethery v. State, 692 S.W.2d 686, 700
(Tex. Crim. App. 1985)). Hence, the officers had the responsibility to inform appellant that the
questions asked during polygraph test, or the test results, could not be used at trial and that any
mention of the test at trial was likewise prohibited. This, coupled with the fact that the officers
initiated the conversation regarding the first interrogation, likely created the belief in appellant's
mind that he was compelled to again discuss the matters raised in the first interview during the
second interview. (20)

 If the deliberate two-step strategy has been used, "postwarning statements that are related to
the substance of prewarning statements must be excluded unless curative measures are taken before
the postwarning statement is made." Seibert at 619 (Kennedy, J., concurring). We agree that
"curative measures should be designed to ensure that a reasonable person in the suspect's situation
would understand the import and effect of the Miranda warning and of the Miranda waiver." Id. 
Examples of appropriate curative measures include: (1) a substantial break in time and circumstances
between the unwarned statement and the Miranda warning (Kennedy); (21) (2) explaining to the
defendant that the unwarned statements, taken while in custody, are likely inadmissible (Kennedy);
(3) informing the suspect that, although he previously gave incriminating information, he is not
obligated to repeat it (plurality); (4) the interrogating officers refrain from referring to the unwarned
statement unless the defendant refers to it first (plurality); or (5) if the defendant does refer to the
pre-Miranda statement, the interrogating officer states that the defendant is not obligated to discuss
the content of the first statement (plurality). (22) No curative steps were taken in this case.

 The officers had the responsibility of applying curative measures at the beginning of the
second interview, or, at the very least, when they referred to the first interrogation of appellant. They
did neither. Such omissions or actions are not likely "to ensure that a reasonable person in the
suspect's situation would understand the import and effect of the Miranda warning and of the
Miranda waiver." Seibert at 622 (Kennedy, J., concurring). Curative measures allow the accused
"to distinguish the two contexts and appreciate that the interrogation has taken a new turn." Id.

 In this case, the officers did not apprise appellant of his Miranda rights when they began
custodial interrogation and failed to apply any curative measures in order to ameliorate the harm
caused by the Miranda violation. Appellant's videotaped statement was therefore inadmissible. We
reverse the judgment of the court of appeals and remand this cause to the court of appeals so that it
may conduct a harm analysis.


Delivered: December 17, 2008

Publish
1. Tex. Penal Code § 19.03(a)(2).
2. The First Court of Appeals initially received appellant's appeal, but transferred the case to the Thirteenth
Court of Appeals. 
3. Officer Sosa testified that a "pocket warrant" is different from a regular arrest warrant in that it expires
after 30 days, while a regular warrant expires when the suspect is arrested or the warrant is recalled. 
4. Officer Sosa did not obtain a pocket warrant for James Ruiz's arrest because, at the time of the
identification, Ruiz was deceased.
5. Appellant conceded that his Malibu had been used in the robbery. 
6. Officer Sosa could not recall the polygrapher's name, but stated that it was a male officer. 
7. Officer Sosa testified that he did not know this to be factually true, but that it had been communicated to
him by the polygrapher. 
8. The videotape was marked as state's exhibit 1. Portions of the interview are missing because the
videotape was stopped at various points, and some portions were redacted from the record. 
9. "A officer from [the Rolla] police department testified that the strategy of withholding Miranda warnings
until after interrogating and drawing out a confession was promoted not only by his own department, but by a
national police training organization and other departments in which he had worked." Seibert at 609.
10. In Miranda v. Arizona, the United States Supreme Court addressed "interrogation practices . . . likely . . .
to disable [an individual] from making a free and rational choice" about speaking. Miranda v. Arizona, 384 U.S.
436, 445 (1966). The Court unequivocally ruled that an accused, held in custody, must be given the adequate and
effective warnings "prior to questioning," not merely before signing a written statement after all the custodial
interrogation is complete. Id. at 445. The failure to give timely warnings generally results in the state being required
to forfeit the use of any statement obtained during that interrogation during its case-in-chief. Id. When a defendant
alleges that the Miranda protections were thwarted, the burden of showing admissibility rests on the prosecution. 
Seibert, 542 U.S. at 609 (quoting Brown v. Illinois, 422 U.S. 590, 604 (1975)).
11. The officer sat down with Elstad and asked him if he knew a person by the name of Gross, and he said
that he did and added that he had heard that there was a robbery at the Gross house. At that point, the officer told
Elstad that he felt that Elstad was involved in the robbery. Elstad looked at him and stated, "Yes, I was there."
12. During cross-examination at the hearing on appellant's motion to suppress, Officer Sosa twice conceded
that he failed to give appellant his proper warnings.


 [Defense]: When you got down to [the police station,] what's the first thing you do?

 

 [Officer Sosa]: We got to the [police station]. I gathered the case file information together so I'd have it at
my disposal. I advised him of why he was arrested again and I asked him if he thought that he might want
to speak with us....

 

 [Defense]: Had you read [appellant] his rights at that time?


 [Officer Sosa]: Had I read him-I hadn't read him his rights at that time, no. 


* * *


 [Defense]: Up until the time [you all] were going to the magistrate, you had not advised [appellant] that he
had any of the rights that you later gave him on the videotape?


 [Officer Sosa]: I did not read him his rights formally, no. 
13. There is no testimony in the record that appellant was told at any time that he could refuse to take the
polygraph examination.
14. In the motion for new trial, appellant's counsel alleged that the state obtained the name of the
polygrapher by calling the police department, but withheld this information until after trial began. 
15. Officer Sosa testified that the first interrogation took place at 1200 Travis and the second interrogation
took place at 61 Reisner, the central holding area. 
16. The Seibert plurality articulated that intent is not the dispositive factor in determining whether an officer
used the question-first strategy "because the intent of the officer will rarely be as candidly admitted as it was here
(even as it is likely to determine the conduct of the interrogation); the focus is on facts apart from intent that show the
question-first tactic at work." Seibert at 616. 
17. The Seibert plurality stated that "it would ordinarily be unrealistic to treat two spates of integrated and
proximately conducted questioning as independent interrogations subject to independent evaluation simply because
Miranda warnings formally punctuate them in the middle." Seibert at 614. "As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier
incriminating statements were made. The strategy is based on the assumption that Miranda warnings will tend to
mean less when recited mid-interrogation, after inculpatory statements have already been obtained." Seibert at 620
(Kennedy, J., concurring).
18. Officer Sosa also testified that they fed appellant at some point during the day, and that appellant was
allowed to call his father and girlfriend, but Officer Sosa could not give a specific time.
19. [Officer Sosa]: Remember, I told you that I'm not going to yank your chain; [that] I'm not going to bull
[s]h** around? 


 [Appellant]: Yeah.
20. The Seibert plurality emphasized that 


 [i]t seems highly unlikely that a suspect could retain any such understanding when the interrogator
leads him a second time through a line of questioning the suspect has already answered fully. The
point is not that a later unknowing or involuntary confession cancels out an earlier, adequate warning;
the point is that the warning is unlikely to be effective in the question-first sequence we have
described.


 Seibert at 614 n.5.


 Justice Kennedy noted that 


[t]he technique used in this case distorts the meaning of Miranda and furthers no legitimate
countervailing interest. The Miranda rule would be frustrated were we to allow police to
undermine its meaning and effect. The technique simply creates too high a risk that postwarning
statements will be obtained when a suspect was deprived of "knowledge essential to his ability to
understand the nature of his rights and the consequences of abandoning them." Moran v. Burbine,
475, U.S. 412, 423-24 . . . (1986).


Seibert at 621 (Kennedy, J., concurring). 
21. The state's assertion must also fail because the polygraph test, which was not completed until
approximately 4:30 p.m., was an integral part of the unwarned statement. Less than an hour after the polygraph test
ended, police began the second interrogation process, thereby leaving an insubstantial break between the two
interrogations. 
22. These examples are nonexclusive, but they provide guidance as to when curative measures are needed.